**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JERMAINE SCOTT, | |
| Plaintiff, | Civil Action No. 20-14209 (FLW) |
| v. | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | **OPINION** |
| Defendant. | |

**WOLFSON, Chief Judge:**

Jermaine Scott ("Plaintiff"), currently represented by counsel, appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that while substantial evidence supported the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") assessment, the ALJ failed to both inform Plaintiff of his due process right to cross-examine the vocational expert ("VE") and meet the heightened duty to develop the factual record when a claimant is unrepresented. Accordingly, the ALJ's decision is **VACATED**, and **REMANDED** for further proceedings.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, born on November 2, 1976, is 5'7" and weighs 178 pounds. (A.R. 9, 627.) Plaintiff filed this application for Supplemental Social Security income on May 16, 2017, alleging a period of disability beginning on October 5, 1983, due to disruptive mood dysregulation disorder,

1

antisocial personality disorder, nonadherence to medical treatment, and adjustment disorders, with a depressed mood.  (A.R. 24, 82.)  This application was denied initially on August 17, 2017, and upon reconsideration on January 31, 2018.  (*Id*.)  Plaintiff then filed a written request for a hearing, which was held on June 27, 2019.  (*Id*.)  At the hearing, Plaintiff was informed of his right to representation by counsel, but chose to testify without the assistance of an attorney.  (*Id*.)  On July 23, 2019, the ALJ found Plaintiff was not disabled under the relevant statutes.  (A.R. 24-35.)  Plaintiff requested review of the ALJ's decision by the Appeals Council, which the Appeals Council denied on August 31, 2020, after determining that there was no basis for reviewing the ALJ's decision.  (A.R. 10.)

## A.  Review of Medical Evidence

### i.   Medical Records

From 2002 to 2017, Plaintiff received mental health treatment while incarcerated.  (A.R. 332-620.)  During that time, Plaintiff was diagnosed with disruptive mood dysregulation disorder, antisocial personality disorder, nonadherence to medical treatment, and adjustment disorders, for which he was prescribed Benadryl, Prozac, and Minipress.  (A.R. 334-335.)  Plaintiff's records show noncompliance issues with medication and a negative attitude, but improved behavior and motivation once he consistently took his medication.  (A.R. 335, 348, 360, 361, 392, 408-409.)  Upon intake at a new facility, Plaintiff reported no history of psychiatric treatment or medications, and to the examiner, appeared psychologically stable, with no evidence of a major mood, anxiety or thought disorder.  (A.R. 618.)

Upon release from incarceration, Plaintiff received a psychological consultative examination from Jacqueline Farnese, Psy.D., on July 24, 2017.  (A.R. 626.)  At the examination, Plaintiff stated he gets anxious and angry in crowds, is quick to startle, and does not like loud

noises.  (*Id.*)  Plaintiff also explained that he sometimes had visual hallucinations of shadows and auditory hallucinations.  (*Id.*)  Plaintiff reported having nightmares, disrupted sleep, and paranoia at night.  (*Id.*)  Plaintiff stated he was in counseling in prison and took special education classes due to a lack of focus.  (*Id.*)  Regarding Plaintiff's mental status, Dr. Farnese noted he was oriented to person and place, his affect was bright, he was responsive, friendly, circumstantial at times, but was able to stop himself and redirect.  (A.R. 627.)  Plaintiff also reported what he had for dinner the prior night and knew who the first President was, but could not recall the date of the examination, although he did know it was in July 2017.  (*Id.*)  Plaintiff answered 2 of 3 comprehension questions, was able to count backwards by 7 starting with 100, identify objects, and spell "world" forward and backwards.  (*Id.*)  Dr. Farnese's impression was that Plaintiff had PTSD and antisocial personality disorder, his level of functioning was fair, and that Plaintiff stated he could handle his finances, and that if he could not, his aunt would help him.  (A.R. 628.)

On August 24, 2017, Plaintiff visited Dr. Spring Matthews-Brown, M.D., at Warren Adult Medicine, and explained that he had felt agitation and distress since he ran out of his medications the prior month.  (A.R. 638.)  Plaintiff stated he had PTSD and developed depression while incarcerated.  (*Id.*)  Further, Plaintiff requested a note to be excused from job workshops because being around other people made him uncomfortable.  (*Id.*)  Dr. Matthews-Brown diagnosed Plaintiff with PTSD, depressive disorder, low back pain, and bilateral knee pain.  (A.R. 639.)  Dr. Matthews-Brown referred Plaintiff for psychiatric counseling and behavioral health medication.  (*Id.*)

From October 27, 2017, to at least January 3, 2018, Plaintiff met weekly with his therapist, Diane Johnson, Ph.D., of Juvenile & Adult Re-Entry Connections (JARC), regarding medication compliance, improving self-regulation, enhancing emotion regulation, and identifying pro-social

ways of responding to triggers.  (A.R. 641, 647.)  Dr. Johnson completed a medical assessment, and determined that Plaintiff had no limitations in understanding and memory, or sustained concentration or persistence.  (A.R. 644.)   In terms of social interaction, Dr. Johnson found that Plaintiff was limited such that when he interacts with others, he can feel interrogated if being questioned about tasks or time management, among other things.  (*Id*.)  Further, Dr. Johnson determined that Plaintiff was limited in his ability to adapt, in particular, since arriving home from prison, Plaintiff displayed isolative behavior as he remained at home and interacts minimally with others.  (*Id*.)  Dr. Johnson also noted that in any job Plaintiff were to take, due to a history of PTSD, he may require ongoing support, as Plaintiff exhibited changes of mood and may require time to de-escalate if feeling anxious or agitated.  (*Id*.)

On January 24, 2018, Plaintiff underwent a second consultative psychological evaluation with Dr. Farnese.  (A.R. 648.)  Regarding his medication regimen, Plaintiff reported being on Prazosin, Vistaril, Ibuprofen, Seroquel, and Prozac.  (A.R. 649.)  Upon examination, Dr. Farnese noted that Plaintiff's concentration, focusing, judgment, and insight were fair.  (A.R. 650.) Plaintiff was circumstantial when describing things, but Dr. Farnese found him to be redirectable. (*Id*.)  In general, Plaintiff was calm and appropriate to the content.  (*Id*.)  Plaintiff did not get upset or angry, and he was oriented to person and place.  (*Id*.)  Further, Plaintiff knew the month, year, and day of the week.  (*Id*.)  Plaintiff did not know who the first president or current president was, but he was able to recall what he had for dinner the prior night.  (*Id*.)  Plaintiff was able to recall 3 of 3 words immediately, but 1 of 3 after several minutes.  (*Id*.)   Plaintiff stated he was unable to do the serial 7's backwards, but was able to do the serial 3's without a problem.  (*Id*.)  Dr. Farnese's diagnostic impression was that Plaintiff had a mood disorder, impulsive control disorder, PTSD,

and possible antisocial personality disorder.  (*Id*.)  Dr. Farnese also concluded that Plaintiff's functioning was fair.  (*Id*.)

### ii.    Medical Opinion Evidence

State agency psychologists Dr. George Grubbs, Psy.D., and Dr. Leslie Williams, Ph.D., reviewed the medical evidence and assessed Plaintiff's residual functional capacity.  At the initial stage, Dr. Grubbs determined that while Plaintiff may have a mental impairment, it did not appear to be disabling, and that Plaintiff appeared capable of performing simple, repetitive unskilled assignments and tasks in a setting that requires limited public interaction.  (A.R. 92.)  Dr. Grubbs determined that Plaintiff had mild limitations in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (A.R. 88.)  Dr. Grubbs also found that Plaintiff had moderate limitations in interacting with others. (*Id*.)  Dr. Grubbs assessed Plaintiff as not disabled. (A.R. 93.)  On reconsideration, Dr. Williams confirmed these findings.  (A.R. 104, 107, 109.)

## B.  Review of Testimonial Evidence

### i.    Plaintiff's Testimony

The ALJ began the hearing by explaining the purpose of the hearing, how the hearing structurally operates, the procedural posture of the hearing, and the ALJ's role in reviewing the prior record and making an independent decision.  (A.R. 43-44.)  Next, the ALJ discussed Plaintiff's right to have an attorney or someone else present to represent him, and explained that in either case, that person could help protect his rights, request medical records, explain medical terms, and could present evidence in a favorable manner on his behalf, among other things.  (A.R. 44-45.)  Further, the ALJ noted that these attorneys normally worked on a contingency basis, which means, they do not get paid unless the ALJ awards benefits, and in that scenario, they would be

entitled to 25% of any back benefits that are owed to Plaintiff.  (A.R. 45.)  The ALJ also informed Plaintiff that he was allowed to proceed by himself that day, and if he did, the ALJ would still provide him a full and fair hearing, but if Plaintiff wished to find an attorney, the ALJ would grant him a postponement.  (A.R. 45-46.)  When asked if he understood his rights, Plaintiff said, "A little bit."  (A.R. 46.)  In response, ALJ asked whether he had any further questions, to which Plaintiff replied that he had a friend there with him and asked the ALJ whether his friend, who understands his conditions, could stay with him.  (*Id*.)  The ALJ then explained the differences between a representative and a witness, and the differences between each role.  (A.R. 46-47.)  Ultimately, Plaintiff decided to go forward without a representative.  (A.R. 50.)

Plaintiff testified that he was 42 years old, had a GED, and lived with his mother.  (A.R. 53-54.)  Plaintiff stated that he has a driver's license, but that he only drives about three times a week because he gets anxiety while driving.  (A.R. 54.)  When he drives, it is typically to go wash clothes or visit his son.  (*Id*.)  Plaintiff stated that he has not worked since being released from prison.  (A.R. 55.)  After being released from prison, Plaintiff was supposed to participate in Work First New Jersey, a vocational rehab program, but he had his psychiatrist fill out of a form excusing his attendance because being around groups of people made him uncomfortable.  (*Id*.)  In terms of his day-to-day life, Plaintiff stated that his daily activities include doing laundry, watching cars go by outside, talking with his nieces and nephews, and playing games.  (A.R. 60.)

Plaintiff further testified as to his physical and mental medical history and limitations. Regarding his physical limitations, Plaintiff testified that he had a hand disease that caused his hand to peel and blister, and that his fingers get "stuck" when he uses them.  (A.R. 56.)  Plaintiff had surgery one year prior to the hearing, but he stated that it did not help.  (A.R. 57.)  Plaintiff explained that he can pick up light objects, such as a cup, but certain activities, such as writing,

will eventually cause him pain.  (A.R. 57-58.)  Regarding his back and knee pain, Plaintiff testified that he often drops items, and that he has trouble standing too long.  (A.R. 58.)  Plaintiff noted that he was scheduled to begin physical therapy the following month.  (A.R. 59.)  In terms of medications he takes for pain, Plaintiff stated he takes Amoxicillin, Ibuprofen, and Hydrophor ointment.  (A.R 59-60.)

Plaintiff then testified as to his mental impairments, and stated that since he was stabbed in prison, he gets agitated and has high levels of anxiety from being around large groups of people. (A.R. 61.)  This includes being around both strangers and large groups of family members.  (A.R. 62-63.)  Specifically, these situations make Plaintiff feel like the walls are closing in on him.  (A.R. 63.)  But Plaintiff stated that he often speaks to his son without issues and can go to the laundromat because there are never too many people in the room.  (A.R. 63.)  Plaintiff also testified that he has hallucinations where he sees shadows and things coming through the wall.  (A.R. 62.)

The ALJ then examined Plaintiff's witness, Rakema Bey.  (A.R. 65.)  Ms. Bey testified that she has been friends with Plaintiff for over 20 years.  (*Id*.)  Plaintiff and Ms. Bey communicate frequently as Ms. Bey assists Plaintiff with his doctors' appointments and other things he needs help understanding.  (*Id*.)  Ms. Bey confirmed that Plaintiff is in physical pain at times, including foot pain, back pain, standing up in the shower, or bending over.  (A.R. 66.)  In terms of language comprehension, Ms. Bey testified that when Plaintiff is at a doctor's office, he hears what the doctor says, but has a difficult time understanding.  (*Id*.)  As a result, he would ask questions over and over again, and she would have to break down the information to him as she might for a kindergartner.  (*Id*.)  Since starting medication and therapy, Ms. Bey testified that he has some good days and bad days, but the medication appears to help with his temper, which results in Plaintiff being less frustrated and combative.  (A.R. 67.)  Regarding his fear of being around large

groups of people, Ms. Bey explained that if anyone walks by him, he becomes alert because he thinks something bad will happen. (A.R. 67.)

###### ii. Vocational Expert's Testimony

The Vocational Expert, Louis Szollosy, was first asked by the ALJ whether a hypothetical individual of the [Plaintiff's] age, education and work history, with the following limitations could perform work in the national economy:

> If the person is limited to medium exertional work with no more than frequent handling and fingering bilaterally, in addition limited to simple, routine tasks in a static work environment. No fast-paced work or strict production quotas. No direct in dealing with the public. And only occasional interaction with co-workers and supervisors.

(A.R. 69-70.) The VE responded that there would be some occupations such a person could perform. (A.R. 70.) Specifically, the VE stated that this hypothetical person could perform the following jobs: (1) laundry worker and laundry worker II (DOT code 361.685-018), which has a Specific Vocational Preparation (SVP) of 2, a medium exertional level, and is not a production occupation; (2) washer (DOT code 599.687-030), which has an SVP 2, and is an unskilled occupation; (3) dryer attendant (DOT code 581.686-018), which has an SVP of 1, and is classified as an unskilled occupation with medium exertion. (A.R. 70-71.) The ALJ then asked what jobs could be performed if the hypothetical person was limited to only light work. (A.R. 71.) The VE responded that this person could perform the following jobs: (1) bagger (DOT code 920.687-018), which has an SVP of 1, is classified as light exertion, and is further classified as a packer or packager, which is a non-production occupation; (2) assembler (DOT code 739.687-194), which has an SVP of 1, and requires light exertion; (3) lining cementer (DOT code 795.687-022), which has an SVP of 1, and requires light exertion. (A.R. 70-72.) The VE stated that all of these jobs

required an erosion of 50% because each requires more than occasional interfacing with co-workers.  (A.R. 70-72.)

The ALJ then amended the hypothetical, and asked if there were jobs available if the hypothetical "person were to need to work in total isolation from other people, meaning that they couldn't be around the public, co-workers, or supervisors at all throughout the day?"  (A.R. 72.) The VE responded that such a restriction would preclude any type of competitive occupation, although, it is primarily the employer who determines how much time he or she will actually supervise or oversee the operation.  (*Id*.)

After the VE concluded his testimony, the ALJ gave Plaintiff a detailed explanation of his exchange with the VE.  (A.R. 73.)  The ALJ stated that he asked the VE about three different hypothetical individuals with three different sets of limitations, and asked based on those limitations, could this hypothetical person work jobs in the national economy, and if so, which ones.  (*Id*.)  The ALJ then explained what the VE determined based on those hypotheticals, and further explained how he would use those hypotheticals, as well as other evidence in the record, to determine if Plaintiff is disabled.  (A.R. 73-74.)  Plaintiff then stated that he did not understand what the VE was saying, and the ALJ went into further detail about the hypothetical individual discussion, without advising Plaintiff regarding his right to question the VE.  (A.R. 74-77.)

**C.  The ALJ Decision**

On July 23, 2019, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden to demonstrate disability using the standard five-step process.  (A.R. 24-35.)  At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since the May 16, 2017, application date.  (A.R. 26.)  At step two, the ALJ found that Plaintiff had the following severe impairments: mood disorder, PTSD, personality disorder, degenerative joint disease of the

lumbar spine, and s/p right trigger thumb release.  (*Id.*)  At step three, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the relevant CFR.  (*Id.*)  Here, the ALJ specifically considered listings 1.04, 12.04, 12.08, and 12.15.  (A.R. 26-27.)  In making this finding, the ALJ considered the "Paragraph B" criteria, and determined that Plaintiff had moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself.  (A.R. 27.)

Next, the ALJ determined Plaintiff's residual functional capacity.  (A.R. 28.)  After considering the record, the ALJ stated that Plaintiff "has the [RFC] to perform medium work . . . except subject to the following limitations: (1) frequent handling and fingering bilaterally; (2) only simple, routine tasks in a static work environment; (3) no fast paced work or strict production quotas; (4) no direct dealing with the public; and (5) only occasional interaction with coworkers and supervisors."  (A.R. 28.)  At step four, the ALJ found that Plaintiff had no past relevant work.  (A.R. 33.)  Last, at step five, the ALJ determined that Plaintiff had the RFC to perform jobs that exist in significant numbers in the national economy.  (*Id.*)  As such, the ALJ determined that Plaintiff has not been under a disability since the application date.  (A.R. 34.)

## II.   <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42

U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423(d)(2)(A). Eligibility

11

for supplemental security income requires the same showing of disability.  *Id*. § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity."  *Id*. § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See Id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  *Id*. § 404.1522(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id*. § 404.1522(b)(1).  A claimant who does not have a severe impairment is not considered disabled.  *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").  *Id*. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits.  *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  *See id*. § 404.1526(a). If there is more

than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment.  *Id*.  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar.  *Williams*, 970 F.2d at 1186.  If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work.  20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  *Plummer*, 186 F.3d at 428.  Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy."  *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled.  *Id*.

III.   **PLAINTIFF'S CLAIMS ON APPEAL**

First, Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence, because the ALJ did not provide legally sufficient reasons for rejecting the more restrictive functional capacity findings of Plaintiff's state psychological examiners.  (Pl. Br. at 6.) Second, Plaintiff also asserts that the ALJ's RFC assessment is not supported by substantial evidence, because the ALJ failed to explain, or take into consideration, his implicit rejection of the

therapist's view that Plaintiff needed de-escalation time after changes in mood.  (Pl. Br. at 13.)
Third, Plaintiff maintains that the ALJ did not provide a full and fair hearing to Plaintiff, who was
unrepresented, and as such, this Court should remand the matter for a new hearing.  (Pl. Br. at 15.)

### A.  The ALJ's RFC Determination is Based on Substantial Evidence

#### i.  The ALJ's RFC determinations as to social interaction and concentration and persistence are based on substantial evidence

Plaintiff maintains that the ALJ "implicitly rejected" two findings from the Consultative
Examiners' mental RFC assessments because the ALJ's RFC, purportedly, failed to address each
finding.  First, as to social interactions, Plaintiff claims that the ALJ implicitly rejected the
Consultative Examiners' finding that Plaintiff "would have difficulties accepting criticism from
supervisors and cooperating with others."  (Pl. Br. at 9.)  Second, as to concentration and
persistence, Plaintiff claims that the ALJ implicitly rejected the Consultative Examiners' finding
that Plaintiff "would have difficulties [with] maintaining attention [and] concentration for
extended periods."  (Pl. Br. at 10.)  In Plaintiff's view, these findings are more restrictive
limitations than those found by the ALJ's RFC.  (Pl. Br. at 6.)  Defendant disagrees, and argues
that the ALJ's RFC was either consistent with the findings of the Consultative Examiners or found
Plaintiff to be more limited than the consultative opinions found.  (Def. Br. at 9-12.)  Here, the
ALJ's RFC assessment as to social interaction, and concentration and persistence is based on
substantial evidence.

"[RFC] is defined as that which an individual is still able to do despite the limitations
caused by his or her impairment(s)."  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121
(3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. §
404.1545(a).  When a case is brought to an administrative hearing, the ALJ is charged with
ultimately determining the claimant's RFC.  20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e),

416.946(c).  "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  When assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments which are supported by the record, including those considered non-severe.  20 C.F.R. §§ 404.1545 (a)(2), 416.945 (a)(2); *see also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d. Cir 2005).  "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted); *see McCrea*, 370 F.3d at 360 ("Substantial evidence has been defined as 'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate.'" (citation omitted)).

Plaintiff is incorrect that the ALJ implicitly rejected the Consultative Examiners' findings. In that regard, Plaintiff's cherry-picked statements from the Consultative Examiners' mental RFC assessment lack context, and further, mischaracterize the Consultative Examiners' conclusions. Indeed, Plaintiff's consultative examiners made mental RFC findings as to three categories: (1) concentration and persistence; (2) social interaction; and (3) adaptation. (A.R. 91, 107.)  The Consultative Examiners' finding that Plaintiff "would have difficulties accepting critique from supervisors & cooperating w[ith] others" pertained only to Plaintiff's social interaction category. (*Id.*)  In the same vein, the Consultative Examiners' finding that Plaintiff "would have difficulties [with] maintaining attention [and] concentration for extended periods" pertained only to Plaintiff's

concentration and persistence category.  (*Id*.)[1]  These limitations, in combination with the adaptation category limitations, formed the basis for the Consultative Examiners' overall mental RFC determination—which ultimately was that Plaintiff "appears capable of performing simple, unskilled repetitive assignments [and] tasks in a setting [with] limited public interaction."  (A.R. 92, 107.)  Put in simpler terms, after examining all of Plaintiff's mental limitations, including the social interaction and concentration and persistence limitation findings upon which Plaintiff relies, the final assessment of Plaintiff's limitations was that he is capable of working so long as the job was limited to "simple, unskilled repetitive assignments" and "limited public interaction."  (*Id*.)

        Not only is the ALJ's RFC determination consistent with the Consultative Examiners' final assessment, but the ALJ's RFC goes *further*, and limits Plaintiff to work with "only simple, routine tasks in a static work environment," "no direct dealing with the public," and "only occasional interaction with co-workers and supervisors."  (A.R. 28 (emphasis added).)   These additional restrictions were based on the ALJ's findings on the record.  In evaluating the persuasiveness of Plaintiff's statements regarding his symptoms as to understanding, social interaction, concentration, and adaptation, the ALJ stated that based on Plaintiff's "testimony and the results of his mental status examinations, his reports are consistent with a person who has moderate functional limitations in those areas.  I find these limitations are ongoing and of a frequency and intensity that they require consideration in the" RFC.  (A.R. 32.)  For these reasons, the ALJ "restricted the complexity of tasks to simple and routine, precluded some workplace stressors (such as changes and fast pacing), and . . . reduced the level of social interaction."  (*Id*.)  In light of this analysis, it is clear that the ALJ did not "implicitly reject" the findings of the consultative

---

[1] The Court notes that aside from these lone statements in the Consultative Examiners' mental RFC assessments, Plaintiff does not cite to any evidence or statements from treating physicians or psychiatrists that these two limitations exist or, if they do exist, would impact the ALJ's RFC.

examiners, but rather, directly considered and incorporated them, along with other limitations gleaned from the record, into Plaintiff's RFC.  *See Burnett*, 220 F.3d at 121.  As such, Plaintiff's limitations as to social interaction and concentration and persistence are based on substantial evidence on the record.

### ii.  The ALJ's RFC determination as to Plaintiff's mood swings is based on substantial evidence

Similar to the Consultative Examiner's statements *supra*, Plaintiff argues that substantial evidence does not support the ALJ's RFC assessment, because the ALJ also "implicitly rejected" Dr. Johnson's medical opinion when the ALJ failed to address the opinion's finding that Plaintiff "may require ongoing support from administration, as the client may exhibit changes in mood, [and] may require time to de-escalate if feeling anxious or agitated."  (Pl. Br. at 13; A.R 644.)  In that connection, Plaintiff reasons that the ALJ's RFC assessment is deficient as it does not include any off-task time, including for de-escalation.  (Pl. Br. at 13.)

As an initial matter, Plaintiff "bears the burden to demonstrate harm," as in, "how the error to which he points could have made any difference" in the outcome of his application.  *Holloman v. Comm'r of Soc. Sec.*, 639 Fed. Appx. 810, 814 (3d Cir. 2016) (quoting *Shineski v. Sanders*, 556 U.S. 396, 409-13 (2009)).  But here, Plaintiff asserts, in a wholly speculative manner, that had the ALJ considered Dr. Johnson's statement, the ALJ would have made a different RFC assessment, which would, in turn, have caused the ALJ to ask the VE different hypothetical questions, that, Plaintiff implies would have led to a finding of disability.  Plaintiff also argues that "there is no evidence that [Plaintiff] could perform significant numbers of jobs given Dr. Johnson's opinion at issue[.]"  (Pl. Br. at 13-14.)  Plaintiff's suppositions are conclusory, at best, and based on an unverifiable and speculative chain of events.  It is important to note that Dr. Johnson did not opine that the need for de-escalation would somehow impact Plaintiff's ability to work.  (*See* A.R. 644.)

As such, these statements, taken out of context, are insufficient to show how ignoring Dr. Johnson's statement regarding de-escalation affected the Plaintiff's RFC. *Holloman*, 639 Fed. Appx. at 814 (finding plaintiff failed to show harm because she did not explain how she might have prevailed at step three if the ALJ had been more thorough, and therefore, plaintiff provided no basis for the court to remand).

Regardless, the ALJ's RFC determination clearly took Dr. Johnson's report and Plaintiff's mood swings into account, and as such, the ALJ's RFC is based on substantial evidence.  In the Opinion, the ALJ stated that, between October 27 and December 1, 2017, Plaintiff attended weekly therapy sessions under the guidance of Dr. Johnson at the Juvenile & Adult Re-Entry Connections for treatment of a mood disorder and personality disorder.  (A.R. 30.)  Regarding Dr. Johnson's reports, the ALJ was persuaded by her statement that the Plaintiff "has limitations in social functioning and adaptation" because such statements were consistent with the medical evidence, as well as Plaintiff and Ms. Bey's testimony.  (A.R. 33.)  As such, the ALJ "considered Dr. Johnson's statements in formulating" the RFC.  (*Id*.)  Further, the ALJ noted that while in prison, Plaintiff was diagnosed with disruptive mood dysregulation disorder, antisocial personality disorder, and adjustment disorder with a depressed mood, but also that when Plaintiff stuck to a medication regimen his behavior improved.  (A.R. 29.)  The ALJ also noted that Dr. Jacqueline Farnese, Psy.D., conducted a psychological examination, and diagnosed Plaintiff with PTSD and antisocial personality disorder, but stated that Plaintiff had a fair level of functioning and could handle his own funds or seek help when needed.  (A.R. 30.)  The Opinion pointed out that Dr. Matthews-Brown diagnosed Plaintiff with PTSD and depressive disorder, and that Plaintiff's medication regimen was effective, aside from the fact that it made him sleepy.  (A.R. 30.) Additionally, the ALJ discussed Plaintiff's second psychological examination with Dr. Farnese,

which diagnosed Plaintiff with mood disorder, impulse control disorder, PTSD, and possible antisocial personality disorder.  (A.R. 30.)  The ALJ also took Plaintiff's hearing testimony into account, where Plaintiff stated that he does not like to drive because other drivers quickly agitate him or make him anxious.  (A.R. 31.)  Plaintiff's witness, Ms. Bey, also reported that Plaintiff's medication had improved his conditions as it relates to controlling his temper and dealing with frustration.  (*Id*.)  In assessing the persuasiveness of Plaintiff's statements as to his symptoms, the ALJ noted that Plaintiff had reported that social interaction tended to aggravate his mental health symptoms.  (A.R. 32.)  The ALJ assessed that these issues with social interaction could reasonably cause limitations, and as such, the ALJ accounted for this by incorporating manipulative and social restrictions in his RFC.  (*Id*.)

Accordingly, ALJ's RFC is based on substantial evidence as the ALJ clearly considered Plaintiff's mood swings and disorders in formulating the RFC.

### B.  The ALJ Failed to Give Plaintiff the Opportunity to Cross-Examine the VE

Plaintiff contends that the ALJ failed to meet the heightened duty placed on ALJs to develop the record when a claimant attends a hearing unrepresented.  (Pl. Br. at 15.)  Specifically, Plaintiff reasons that the ALJ failed to explain to Plaintiff that, following the ALJ's direct examination, Plaintiff had a right to cross-examine the VE.  (Pl. Br. at 17.)  In that connection, Plaintiff argues that when he attempted to ask questions about the VE's statements, the ALJ did not allow the VE to answer, and instead, spoke on behalf of the VE.  (*Id*.)  Additionally, Plaintiff argues that the ALJ failed to develop an adequate record, because the ALJ failed to: (1) define for the VE what "fast-paced work" meant; (2) ask the VE about the consultative examiner's RFC findings, which Plaintiff claims reflected greater limitations than the ALJ's RFC finding; (3) ask about the effect of Plaintiff's need for time to de-escalate; and (4) voir dire the VE.  (Pl. Br. 16-

17.)   Defendant disagrees that the ALJ failed to meet the heightened duty for unrepresented claimants, arguing that the ALJ fully explained his role and the role of the VE, asked appropriate hypothetical questions, and then gave Plaintiff an opportunity to ask the VE questions.  (Def. Br. at 13-14.)  I agree with Plaintiff.

In Social Security proceedings, "[c]onsistent with due process, claimants must be given an opportunity to cross-examine the [VE]."  *Wallace v. Comm'r of Soc. Sec.*, No. 13-6755, 2014 WL 6667362, at *6 (D.N.J. Nov. 21, 2014) (citing *Wallace v. Bowen*, 869 F.2d 187, 192 (3d Cir. 1989)). This is because, as the Third Circuit has stated, "an opportunity for cross-examination is an element of fundamental fairness of the hearing to which claimant is entitled[.]"  *Bowen*, 869 F.2d at 192.

Moreover, when a "claimant is unrepresented," the ALJ is required to exercise a "heightened level of care" and "assume a more active role" to ensure that the record is more fully developed.  *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); *see Pryor v. Astrue*, No. 08-312, 2009 WL 890581, at *4 (W.D. Pa. Mar. 27, 2009) ("Implicit within this 'heightened level of care' is an affirmative obligation to assist the claimant in developing a complete administrative record." (citing *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003))); *Jackson v. Colvin*, No. 13-00886, 2014 WL 4955231, at *11 (M.D. Pa. Sept. 30, 2014) ("Where a claimant is unrepresented at the administrative hearing, 'the ALJ must scrupulously and conscientiously probe in, inquire of, and explore for all the relevant facts.'" (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985))).  However, a failure to meet this heightened duty to develop the factual record, by itself, does not require remand.  *See Phifer ex rel. Phifer v. Comm'r of Soc. Sec.*, 84 F. App'x 189, 190-91 (3d Cir. 2003) (noting remand is proper if "the lack of counsel prejudices a claimant or where the lack of counsel leads to an administrative proceeding marked by unfairness.").  A plaintiff must

also show clear evidence that he or she was prejudiced by the outcome. *Herring v. Colvin*, 181 F. Supp. 3d 258, 268 (M.D. Pa. 2014) ("However, even if the ALJ errs in developing the factual record, the Plaintiff must show clear evidence of prejudice from this error[.]" (citing *Livingston*, 614 F.2d at 345)); *see Cartagena v. Comm'r of Soc. Sec.*, No. 10-05712, 2012 WL 1161554, at \*4 (D.N.J. Apr. 9, 2012) ("Additionally, ALJ's passivity in developing the record will only be sufficient for remand or reversal when it has clearly prejudiced the claimant, which is not apparent here."); *see also Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) ("When the claimant has been informed of his right to counsel before an administrative hearing and knowingly waives it, his lack of representation is not, of itself, cause for remand.").

As such, when a Plaintiff is unrepresented, and therefore the ALJ's heightened duty to develop the record applies, the ALJ must notify Plaintiff of his or her right to cross-examine the VE. *Wallace*, 2014 WL 6667362, at \*7 (remanding to ALJ after finding that the ALJ failed to notify or inform the plaintiff of her right to cross-examine the VE and failed to sufficiently develop the record as to the plaintiff's limitations.); *Velez v. Comm'r of Soc. Sec.*, No. 17-02914, 2018 WL6787538, at \*6 (D.N.J. Dec. 26, 2018) (finding that "the transcripts contain no statement from the ALJ notifying Plaintiff that he could cross-examine the VE" and stating that "Plaintiff was prejudiced by the lack of counsel, who may have challenged the ALJ's representations to the VE and cross-examined the VE's direct testimony."); *Nevins v. Comm'r of Soc. Sec.*, No. 16-5765, 2017 WL 2450280, \*3 (D.N.J. June 5, 2017) (finding that the "lack of representation resulted in prejudice at the administrative hearing" when an attorney might have "cross examined the VE's direct testimony"). If the ALJ fails to notify Plaintiff of the right to cross-examine the VE, and Plaintiff is prejudiced by the inability to cross-examine the VE, remand is proper.

Here, remand is proper because Plaintiff was not notified of, or given an opportunity to, cross-examine the VE in a manner meeting the heightened standards placed on ALJs.  Although I agree with Defendant that the ALJ properly explained the role of the VE and the purpose of his hypothetical questions to the VE, there are two reasons that lead me to find that the ALJ's heightened duty and due process were not met.  First, the ALJ's cursory explanation as to whether Plaintiff could ask the VE questions, particularly in light of the ALJ's heightened duty and Plaintiff's ability to comprehend, was completely ambiguous and insufficient.  Second, and in that connection, when Plaintiff did express confusion or attempt to ask the VE questions, the ALJ either ignored Plaintiff or failed to assist him.

First, after the ALJ explained the role of the VE and the manner in which the VE was going to give testimony, the ALJ stated:

> I'm going to do my best to explain exactly what his testimony means, how it relates to your case, how it relates to my decision.  And then if you have any questions or anything else you want to say about that, we can take care of it after he testifies.

(A.R. 50 (emphasis added).)  Later, after the ALJ conducted direct examination of Plaintiff, the ALJ explained that he was going to now speak to the VE, and stated:

> Again, I will do my best to explain what his testimony means, how it relates to your case, and how it relates to my decision.  And like I said, if there's anything else you want to ask me or anything else that you think you ought to tell me, we'll take care of that before we conclude the hearing.

(A.R. 68.)  After the VE answered the ALJ's hypothetical questions, the ALJ explained to Plaintiff the meaning of his conversation with the VE and how that conversation would factor into his overall decision-making as to Plaintiff's disability status.   (A.R. 73-74.)   Following this explanation, the ALJ asked, "Before we conclude the hearing today though, is there anything – any other questions or anything else you want to tell me?"  (A.R. 74.)  After a brief back and forth between the ALJ and Plaintiff, which I will discuss *infra*, and before ending the hearing, the ALJ

asked Plaintiff, "Do you have any other questions or anything else you want to tell me?"  (A.R. 77.)

The ALJ's explanation to Plaintiff of his due process right to cross-examine the VE was ambiguous, at best.  "At no point, did the ALJ [affirmatively] inform Plaintiff of [his] right to cross-examine the vocational expert's testimony."  *Wallace*, 2014 WL 6667362, at *7 (alteration in original).  In each situation, here, the ALJ stated that Plaintiff may ask questions, but even to this Court, let alone Plaintiff, these statements appear to direct Plaintiff to only ask questions to the ALJ, rather than the VE.  Further, prior to the VE testimony, the ALJ asked Plaintiff's witness, Rakema Bey, about Plaintiff's comprehension ability, and Ms. Bey testified that she attends Plaintiff's doctors' appointments with Plaintiff because Plaintiff has "a hard time comprehending, so I kind of break it down for him.  It's like someone who is like a kindergartner can understand . . . .  And he'll keep asking over and over and I'll just keep explaining to the best that I know how to so I know he knows."  (A.R. 66.)  In this context, and in light of the ALJ's heightened duty to assume a more active role in the hearing, it is clear the ALJ's ambiguous explanations as to Plaintiff's ability to cross-examine the VE were wholly insufficient.

Additionally, while the VE was testifying, Plaintiff expressed confusion, and the ALJ either ignored Plaintiff or failed to clarify his questions and redirect them to the VE.  After the VE answered the ALJ's question about the occupations a hypothetical claimant could perform, an answer which included occupation names, DOT code numbers, and terms like "SVP," Plaintiff interjected, and asked, "What the hell is he saying?"  (A.R. 70.)  According to the transcript, this question was ignored, and the VE continued testifying regarding possible occupations for the hypothetical person.  (*Id*.)  Following the VE's testimony, the ALJ asked if Plaintiff had any questions, and Plaintiff asked:

> Well, what was the jobs he was saying like I don't like – I don't understand that.
> Like he said the jobs that I could work at or did he say it was a might or something.
> I don't understand what he was saying like[.]

(A.R. 74.)  The ALJ interjected, and attempted to explain the meaning of the hypothetical person

question.  (A.R. 74-75.)  Plaintiff then brought up the VE's statement that a hypothetical person

could work as a laundry worker, and asked, "Don't a laundry worker be around a lot of people

throughout the day?"  (A.R. 75.)  Once again, the ALJ answered instead of the VE, and explained

that the laundry worker job was merely a job in the DOT, which is a list of occupations.  (A.R.

75.)  Plaintiff then asked:

> [S]o you should have asked him about from a person that been through a whole –
> prison for 17 years, abuse from your mom for about – damn near your whole life.
> Can he answer that question too?

(A.R. 75.)  The ALJ responded "no" and that the VE was not a doctor and it was not the VE's job

to analyze Plaintiff's situation.  (A.R. 75-76.)

Given this back and forth, it is clear Plaintiff was not given any opportunity to interact with

the VE in any manner, let alone cross-examine the VE.  Plaintiff was prejudiced both by the ALJ's

insufficient notification of his right to cross-examine the VE, and the resulting lack of knowledge

that he even had the ability to ask clarifying questions to the VE.  As Plaintiff correctly points out,

because Plaintiff was unaware that he was allowed to cross-examine the VE, he was unable to ask

questions about certain complex or key terms, such as the meaning of "fast-paced work," or ask

the VE about whether the hypotheticals were appropriately taking into account his past mental

health diagnoses, which it appears he attempted to do by bringing up his past in prison.  Therefore,

in conclusion, "Plaintiff was prejudiced by the lack of counsel, who may have challenged the

ALJ's representations to the VE and cross-examined the VE's direct testimony."  *Velez*, 2018

WL6787538, at *6.  For these reasons, it is necessary to remand for a re-hearing that meets the standards of due process.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the ALJ's decision is **VACATED**, and the Court will **REMAND** the matter for further proceedings. An appropriate order shall follow.


Date: January 25, 2022                                    /s/ Freda L. Wolfson
                                                          Freda L. Wolfson
                                                          U.S. Chief District Judge